■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v FRANK DI NAPOLI, Respondent. — Order, Supreme Court, New York County (Robert Haft, J.), dated December 28, 1982, dismissing the indictment, charging the defendant Frank Di Napoli with conspiracy to sell and sale of drugs, on the grounds of the legal insufficiency of the evidence presented to the Grand Jury, affirmed for the reasons stated by Justice Haft. Concur — Fein, Milonas and Kassal, JJ.

Sullivan, J. P., dissents in a memorandum as follows: The People appeal from the dismissal of an indictment on the ground that the evidence presented to the Grand Jury was legally insufficient to establish that defendant committed the offenses charged.

During 1981, police officers conducted a large-scale investigation into the distribution of narcotics in New York, Queens and Bronx Counties. The investigation, which included a number of drug purchases by an undercover officer and involved the extensive use of electronic eavesdropping and surveillance, led to seven indictments charging the 12 subjects of the investigation, among them defendant, with conspiracies to sell narcotics and with the sale and possession of heroin and cocaine. The charges against defendant were based on his alleged participation in heroin sales to the undercover officer on June 26, August 19, and September 11, 1981, and an attempted heroin sale on September 24, 1981. As a result, defendant, Nicholas Iannuzzi, John Pagano and Thomas Metro were charged in one of the indictments with one count of conspiracy in the second degree for their activities from May 28, 1981 to September 22, 1981. They were also charged with two counts of criminal sale of a controlled substance in the second degree and four counts of criminal possession of a controlled substance in the third degree for the August 19 and September 11 sales. Edith Kovaks and William Basterville were named as unindicted coconspirators.

The following evidence was presented to the Grand Jury. Since resolution of the issue presented requires close scrutiny of the fact, the recitation is necessarily detailed. On June 25, 1981, at about 3:20 P.M., the undercover officer telephoned Iannuzzi to ask whether he could purchase, as soon as possible, one ounce of heroin. Iannuzzi said he would call back in 15 minutes. Within minutes Iannuzzi called Basterville, who when eventually reached, agreed to have "one" available at 1:00 P.M. the next day. At around 3:55 P.M., Iannuzzi called the undercover officer back and told him that there was "no problem", that they should meet the next day, around 11:30 A.M. near the Grass Restaurant

at 71st Street and First Avenue in Manhattan, and that the price was "the same" as the last time.*

The following day, at around 11:30 A.M., the undercover officer, after Iannuzzi had entered his car, which was parked at 71st Street and First Avenue, removed $12,000 from the glove compartment and gave it to Iannuzzi. Iannuzzi then exited the car and approached a woman, later identified as Kovaks, who was nearby, and the officer followed. The three conversed. Iannuzzi said he was going to "pick up the package", and he and Kovaks left in a taxicab, followed by other officers participating in the investigation. After approximately 10 minutes Kovaks left the cab and Iannuzzi proceeded alone to Bill's Portside Bar on East Tremont Avenue in The Bronx, arriving at around 12:05 P.M.

Iannuzzi met with Basterville outside the bar. They spoke briefly and then went inside. Later, Pagano left the bar and entered his car, to be joined five minutes later by Basterville. The two men then drove off together.

Within a half hour defendant and Metro had a conversation outside Provost Auto Parts, a Bronx junkyard where both men worked. Metro then entered his car and drove away. Shortly thereafter Basterville and Pagano parked near Metro's house in The Bronx.

Later that afternoon Basterville and Pagano were seen at the corner of Tremont and Randall Avenues in The Bronx. There, Basterville met with Iannuzzi. When Basterville left, Iannuzzi returned to Bill's Portside Bar. Sometime that afternoon Iannuzzi called the undercover officer to tell him that he would be "stuck" until about 6:00 P.M.

That evening, at about 5:35 P.M., Iannuzzi met Basterville outside the bar. The two men then went inside together. About five minutes later Pagano came outside and got into his car. After a lapse of another five minutes, Basterville also came out and joined Pagano and the two drove away together.

At about the same time, Metro left his home and entered his car. Five minutes later a blond-haired man parked his car near Metro's. Metro left his car and got into the blond man's vehicle. Together they drove to defendant's home at 47 Palmer Avenue in Mount Vernon. The blond-haired man waited outside while Metro went into defendant's house, where he stayed for about 40 minutes. The blond-haired man and Metro then drove to the parking lot behind Metro's home, where Basterville and Pagano were waiting in a car.

---

\* An earlier sale had taken place on June 18, 1981 and was described in the Grand Jury minutes. Defendant was not, however, observed as a participant in it.

Around 6:55 P.M., Basterville and Pagano parked their car behind Iannuzzi's car on Tremont Avenue near Bill's Portside Bar. Iannuzzi walked up to Pagano's car and entered it. About a minute later, Iannuzzi returned to his car, and he and his brother drove to 71st Street and First Avenue in Manhattan. At around 7:20 P.M., Iannuzzi walked up to the undercover officer, who was sitting in the Grass Restaurant, and suggested that they go to the men's room downstairs. Once there, Iannuzzi removed a brown envelope containing plastic bags with white powder from under his shirt and gave it to the officer. The officer and Iannuzzi then returned to the restaurant and Iannuzzi left. The officer immediately went to the precinct, where he vouchered the white powder, which, upon analysis, was found to contain ⅞ of an ounce plus 47 grains of heroin.

Almost two months later, on August 19, 1981, at about 3:20 P.M., the undercover officer telephoned Iannuzzi and told him that everything "looked good to do business" that day. Iannuzzi said that he would have "to call his guy". After being assured that "the package was the original one from the first time" and given a price, the officer called back to tell Iannuzzi that "everything was fine on [his] end." Iannuzzi said that he would "put the wheels in motion right away." The officer said that he would wait for Iannuzzi's call.

Within minutes of the officer's second call, Iannuzzi called Pagano at his place of work. Pagano was not there, and Iannuzzi left a message asking Pagano to call him at 5:30 P.M. About 20 minutes later, Iannuzzi telephoned the undercover officer to tell him that his "guy" was calling back at about 5:50 P.M., and that he would telephone the officer again to arrange to meet him at about 6:30 P.M. Iannuzzi did, in fact, call the officer again that afternoon to confirm the meeting.

That evening, at about 6:30 P.M., the undercover officer was sitting in his car at 74th Street, between First and Second Avenues in Manhattan, when Iannuzzi entered the car and said "everything was set to go." After Iannuzzi confirmed that the price was "ten-five", the officer gave him $10,500. Iannuzzi told the officer to call Kovaks at 9:00 P.M. to tell her where he could be located, and that Iannuzzi would meet him there. Iannuzzi then drove to Clarence and Layton Avenues in The Bronx with his brother.

At around 7:45 P.M., Metro and Pagano left Metro's home together and drove to the corner of Morris Park Avenue and Williamsbridge Road in The Bronx in Pagano's van. Metro got out of the van and walked north on Williamsbridge Road until he came to defendant's car. Metro talked briefly with defendant,

who was sitting with a woman. Then Metro and Pagano drove back to Metro's home. Later, at around 8:10 P.M., Metro again left his home, and he and Pagano drove to Conner Street and Boston Road in The Bronx, where they parked. Metro, alone, went into the Pine Tree Tavern on Boston Road.

Metro sat down next to a woman at the bar. About five minutes later defendant entered and stood behind them. Defendant and Metro talked. They also "touched hands and appeared to be passing something." Several minutes later Metro left.

After leaving the bar Metro approached Pagano, still in the van, and spoke with him for several minutes. Pagano then left alone, driving to the corner of Clarence and Philips Avenues in The Bronx, where he stopped his van in front of Iannuzzi's car, alongside of which Iannuzzi and his brother were standing. Iannuzzi got into the van with Pagano. Then Iannuzzi drove off with his brother to 74th Street between First and Second Avenues in Manhattan, where he exited his vehicle and entered the undercover officer's car, which was parked nearby. Iannuzzi told the officer that "everything went good" and handed him a Marlboro cigarette box, inside of which was a clear plastic bag containing white powder. Iannuzzi said it was "the original stuff." Then he left. The officer went immediately to the precinct, where he vouchered the box and its contents. Laboratory analysis of the powder revealed the presence of 7/8 of an ounce plus 47 grains of heroin.

About three weeks later, at about 5:45 P.M. on September 10, 1981, the undercover officer called Iannuzzi and told him that everything was "okay" for a sale that night. Iannuzzi said he could "do it". They agreed on a price of $10,000 or $10,500, and that the heroin would have to take 35 to 40 "hits". The officer, who said that he would call back in a half hour, tried to call Iannuzzi several times that evening, but could not reach him.

The next day, at about 2:55 P.M., the undercover officer telephoned Iannuzzi. Iannuzzi said that he had been unavailable for the officer's return call the night before because he had to take Kovaks to the hospital, but that he had contacted his "guy" that morning. The officer told Iannuzzi to "start it rolling." Within minutes Iannuzzi called Pagano, who said he would "make his call." Iannuzzi and Pagano agreed to meet at 6:00 P.M.

The pen register on Metro's telephone indicated that Metro received a call almost immediately thereafter, at 3:07 P.M. At about 3:20 P.M., Iannuzzi called the undercover officer to say that "everything was all right", and that he would meet his "guy" at 8:00 P.M. The officer and Iannuzzi agreed to meet beforehand, at 4:30 P.M.

At about 4:45 P.M., as the officer was sitting in his car on 74th Street, between Second and Third Avenues, Iannuzzi approached and got into the car. Iannuzzi said he was meeting "John" at 6:00 P.M. and that the price was $12,000. After some haggling they agreed upon $11,500, which the officer paid. Iannuzzi and the officer further agreed to meet later that evening at the Grass Restaurant.

After a 20-minute stopover at Kovaks' house in Queens, Iannuzzi drove to Layton Avenue in The Bronx, where he parked his car and then stood on the corner. At about 6:05 P.M., Pagano stopped his van next to Iannuzzi, and both men went to the rear of the van, where Iannuzzi counted some money and gave it to Pagano.

Pagano was next observed at 7:15 P.M., sitting in his van behind Metro's house. Metro joined him, and they drove to the vicinity of 1819 Williamsbridge Road. After driving around the area they returned to Metro's house. Metro then entered his own car, and both men returned to the vicinity of 1819 Williamsbridge Road in their respective vehicles. After parking his car on Rhinelander Avenue, Metro joined Pagano in his van, and Pagano drove around the corner to Williamsbridge Road and Morris Park Avenue. Defendant's car was parked nearby, directly opposite 1819 Williamsbridge Road at the time.

Metro got out of the van and entered the apartment building at 1819 Williamsbridge Road. About 20 minutes later, at 8:10 P.M., Metro walked out of 1819 Williamsbridge Road and got into Pagano's van, which had been parked directly opposite Metro's car on Rhinelander Avenue. After driving around the area for a while in Pagano's van, Metro got into his own car and drove home. About five minutes after Metro walked out of 1819 Williamsbridge Road, defendant exited from the same building with a woman. The two drove off in defendant's car.

About 40 minutes later, at 8:55 P.M., Pagano walked out of Metro's house and drove his van to the Boar's Head Inn on Middletown Road in The Bronx, where he met Iannuzzi and his brother, who were standing outside. Iannuzzi went up to Pagano and the two men talked. After Pagano left, Iannuzzi made a telephone call at a pay phone. Then he and his brother drove into Manhattan to 74th Street and Second Avenue.

The undercover officer was seated alone inside the Grass Restaurant at about 9:35 P.M. when Iannuzzi walked over to him and said that he had "the package". The two men then left the restaurant together and separated. The officer went to his car and drove around the corner to 74th Street between First and Second Avenues. Iannuzzi came over to the car and handed the

officer a playing card and a container, inside of which were tinfoil and a plastic bag containing white powder. The officer then drove directly to the precinct. The white powder, which he vouchered and had analyzed, contained ⅞ of an ounce plus four grains of heroin.

Three days later, on September 14, 1981, the undercover officer telephoned Iannuzzi to complain about the quality of the package he had gotten on September 11th. Iannuzzi said that it contained the "same stuff" from the "same guy".

Ten days later, on September 24, 1981, at about 5:18 P.M., the undercover officer called Iannuzzi "to find out what's available", saying that he had $30,000 and wanted to "do it all at once." Iannuzzi told the officer to call back in an hour. Iannuzzi immediately called his brother, telling him to go to Pagano's house and to have Pagano call him right away about a sale that night.

About one hour later, at 6:14 P.M., Pagano called Iannuzzi. Iannuzzi said he needed "three" for that night. Pagano said he could "do it". Two minutes later, at 6:16 P.M., Pagano called Metro at his home and said he was coming over immediately. During the remainder of the evening, Pagano telephoned Iannuzzi eight or nine times to find out whether the undercover officer had called. Iannuzzi also tried, unsuccessfully, on at least five occasions, to reach the undercover officer.

The sale was never consummated. At 9:21 P.M. that evening, however, while Iannuzzi was trying to call the undercover officer, defendant called Metro. Their conversation was as follows:

"Metro: Hello.

"Defendant: Yeah.

"Metro: Yeah, I know. I'm still waiting, he called me and he said he was definitely going out with me, definitely. That was only fifteen minutes ago, but, uh, I said what time, he says I just can't give you the time, but I'm definitely going out tonight. I don't know what to tell you, you going home early, late cause I wanted to use your car, you know. You gonna still be around?

"Defendant: I'll be around, yeah.

"Metro: Yeah, all right, uh, if you can in about an hour before you go home or something.

"Defendant: (Inaudible) About ten-thirty or eleven.

"Metro: Good, good.

"Defendant: All right?

"Metro: Beautiful.

"Defendant: All right."

In reviewing the Grand Jury testimony in response to defendant's motion to dismiss, Trial Term found that at least three people — Iannuzzi, Pagano and Metro — took part, as charged, in a conspiracy to sell heroin from May 28, 1981 to September 22, 1981, and participated in two separate heroin sales, one on August 19, 1981 and the other on September 11, 1981. Although it further found that defendant had contact with one of the participants, Metro, on both of the occasions when heroin was being sold, and that, on a third occasion, he had a conversation with Metro which was possibly drug related, Trial Term dismissed the indictment against defendant, finding that that evidence was insufficient as to him to make out a prima facie case for either the sales or the conspiracy.

I would reverse and reinstate the indictment since I find, viewing the evidence as a whole, and according to the Grand Jury the right to draw reasonable inferences from that evidence, that the People presented a prima facie case. Such a case is made out, regardless of whether a petit jury will eventually find the accused guilty beyond a reasonable doubt, when the People offer evidence which, if unexplained or uncontradicted, establishes every element of an offense and the accused's commission thereof. (*See,* CPL 70.10 [1]; *People v Pelchat,* 62 NY2d 97; *People v Calbud, Inc.,* 49 NY2d 389, 394; *People v Puma,* 97 AD2d 740.)

Presented with direct evidence of three drug sales and one attempted sale, the Grand Jury could reasonably infer that defendant was the mystery supplier in all four transactions. In each case, the undercover officer offered to buy heroin from Iannuzzi who, though he would take payment, made it quite clear that he was getting his drugs from someone else. The manner by which the drugs were obtained and their source were shown by Iannuzzi's routine from the time he received the officer's order and the time he made delivery. Iannuzzi would contact Pagano or, in one instance, Basterville, who would then call Metro, who, in turn, would meet with defendant. Thereafter, the chain of contact would reverse. Metro would meet with Pagano or Basterville, who would then meet with Iannuzzi. Shortly thereafter, Iannuzzi would deliver the drugs to the undercover officer. Viewing defendant's position at one end of this spectrum of telephone calls and furtive meetings, the Grand Jury could reasonably, and realistically, infer that it was he who supplied the heroin which Iannuzzi eventually delivered to the undercover officer.

Defendant's role as the supplier was graphically demonstrated in the June 26th sale. Iannuzzi told the undercover officer that he would have the heroin that afternoon. But after

Metro contacted defendant, delivery was postponed until the evening. Since no other event intervened to alter the original plan for delivery, it is obvious that the availability of the heroin was tied to defendant. This was confirmed when, later that evening, shortly after Metro visited defendant's home, Iannuzzi delivered the heroin to the undercover officer. The Grand Jury could reasonably infer that defendant told Metro that the drugs would not be available until the evening, and that he delivered the heroin to Metro that evening when Metro visited his home in Yonkers.

Defendant's role as the supplier was made even clearer during the August 19th sale. Iannuzzi promised to deliver the heroin shortly after 9:00 P.M. At about 8 P.M., defendant and Metro met near 1819 Williamsbridge Road and talked briefly. Within a half hour they met again at the Pine Tree Tavern, where they talked and touched hands. Shortly afterwards, and consistent with the promised delivery time, Iannuzzi gave the undercover officer a Marlboro cigarette box containing heroin. From the sequence and timing of these meetings, the Grand Jury could reasonably infer that defendant and Metro agreed, at the time they met on Williamsbridge Road, that defendant would deliver the heroin later at the Pine Tree Tavern. Certainly the Grand Jury could conclude that the heroin in the Marlboro cigarette box was passed when defendant and Metro touched hands.

In the course of the third sale, on September 11th, defendant again used Williamsbridge Road to rendezvous with Metro. About one hour before the time Iannuzzi promised to deliver the drugs to the undercover officer, Metro, obviously looking for a signal, twice cruised around the 1819 Williamsbridge Road area. On his first visit he took no action. When he returned, however, and saw defendant's unoccupied car parked directly across the street, he entered 1819 Williamsbridge Road. Five minutes after Metro left 1819 Williamsbridge Road defendant also exited the building. The Grand Jury could infer that defendant's unoccupied car was a signal to Metro that defendant was inside 1819 Williamsbridge Road waiting for him, and that when they met there defendant passed him the heroin.

Defendant's involvement in the conspiracy to sell heroin was further demonstrated by the September 24th telephone call he made to Metro, a call which took place while Iannuzzi was attempting to make his largest sale — $30,000 worth of heroin — to the undercover officer, and was nervously trying to reach the officer, who had failed to call back, as promised, to confirm the sale and obtain the specifics of delivery. In their conversation Metro confirmed that he was "going out that night", and

that he would "use [defendant's] car". Since it is self-evident that drug dealers resort to code words and innocuous jargon to mask their activities, the Grand Jury was entitled to use its collective common sense in evaluating that call. (*See, United States v Cicale,* 691 F2d 95, 104-105, *cert denied* 460 US 1082.) It could reasonably infer that the references to Metro's "going out" and the use of defendant's car meant a heroin sale that was supposed to take place that evening and as to which defendant was to supply the drugs. Significantly, since defendant reacted to Metro's mention of "going out" without further inquiry or explanation, the Grand Jury could reasonably infer that the parties understood that the expression meant a meeting to supply drugs.

In reviewing the Grand Jury testimony, Trial Term analyzed each fact as a separate and isolated piece of evidence. Such an approach ignored the clear inferences to be drawn from defendant's pattern of behavior in all four transactions. Moreover, Trial Term substituted its own evaluation of the inferences to be drawn from the evidence for that of the Grand Jury, thereby usurping the Grand Jury's function as the finder of fact. (*See, People v Alaxanian,* 89 AD2d 700, 700-701.) For instance, Metro, busily engaged in obtaining drugs for three separate drug sales, and working against the time constraints of Iannuzzi's scheduled delivery to the undercover officer, would hardly have reason to stop and meet with defendant simply to chat. Had these meetings occurred once or twice, they might be dismissed as coincidence. The Grand Jury, however, was entitled to look at the evidence as a whole and conclude that defendant's actions on the four separate critical occasions when drugs were being obtained were sufficient to sustain an accusation against him of conspiracy to sell drugs and two sales of heroin. (*See, People v Potwora,* 44 AD2d 207, 210-211.)

While defendant was not separately charged with the June 26th sale, and his participation in meetings that preceded it might not be sufficient to establish his involvement in that sale, nevertheless, his two meetings with Metro during a crucial time frame were certainly relevant to the conspiracy charge. While there might be an innocent explanation for these meetings, the Grand Jury, as the fact finder, was entitled to make its own determination as to whether they evidenced defendant's participation in the conspiracy to sell heroin. By not referring to the meetings between defendant and Metro on June 26th, Trial Term totally ignored evidence which the Grand Jury was entitled to consider as probative of defendant's participation in the conspiracy.

Similarly, Trial Term never even referred to the first meeting between Metro and defendant on Williamsbridge Road during the August 19th sale. It dismissed the importance of their second meeting at the Pine Tree Tavern, finding that it was of "tentative quality" and "d[id] not constitute delivery of heroin." Taken in context, however, these two seemingly innocuous meetings were in such harmony with the over-all criminal scheme that they tended to show defendant's involvement in both the conspiracy and that particular sale. (*See, People v Dixon,* 231 NY 111, 116-117.) The Grand Jury was entitled to infer that the arrangements for the transfer of heroin were made during the first meeting and delivery effected during the second. That these meetings might have appeared innocuous is not dispositive, since the Grand Jury was entitled to infer that Metro and defendant used guarded language and evasive movements to disguise their criminal activities.

Trial Term also erred in discounting defendant's and Metro's presence inside 1819 Williamsbridge Road at the time of the September 11th sale because that address is a "large apartment building". Once again, Trial Term viewed this incident discretely, ignoring the fact that in the context of their other, similar meetings, it could hardly be a coincidence that Metro, in his efforts to obtain drugs for Iannuzzi, entered a building in which defendant was also present.

Finally, Trial Term discounted the significance of the September 24th telephone call from defendant to Metro because it was as consistent with innocent as with drug-related conduct, and because it took place two days after the conspiracy charged in the indictment had ended. Surely no one should expect defendant and Metro to speak openly about the sale of heroin. The Grand Jury was entitled to draw its own conclusions about the significance of their conversation. Moreover, even though the conversation took place two days after the conspiracy had terminated, the Grand Jury was still entitled to consider its relevance to defendant's knowledge, state of mind, and relationship with Metro and, thus, his role in the prior sales of heroin and the earlier conspiracy to sell drugs. (*See, United States v Calandra,* 414 US 338, 342-345, 349.)

In conclusion, the People made a prima facie showing that defendant engaged in a conspiracy to sell drugs and that he supplied heroin for Iannuzzi to sell to the undercover officer. His participation in the August 19th and September 11th sales was proven by evidence that he met with Metro at a critical time on those dates and from which the Grand Jury could infer that he supplied Metro with the heroin. Defendant was also shown to

have participated in the June 26th sale, and to have evinced a willingness to supply heroin on September 24th. This evidence was sufficient to sustain an accusation that defendant participated in both the conspiracy and two of the drug sales.

Accordingly, the order granting defendant's motion to dismiss the indictment should be reversed, the motion denied and the indictment reinstated.