THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v STEPHEN SULLIVAN, Respondent.

First Department, April 1, 1986

### APPEARANCES OF COUNSEL

*Steven R. Kartagener* of counsel *(Mario Merola, District Attorney,* attorney), for appellant.

*Bruce A. Smirti* for respondent.

### OPINION OF THE COURT

Per Curiam.

On October 29, 1984, Eleanor Bumpurs was shot and killed by Stephen Sullivan, a 19-year veteran of the police force, who had served for 14 years with the Emergency Service Unit (ESU), and who had been cited for distinguished service 18 times. On that date, the ESU had been summoned to provide back-up assistance in the eviction of "a confirmed emotionally disturbed person armed with a knife and possibly a lye thrower."

Following presentment to a Grand Jury, defendant was indicted for manslaughter in the second degree, in that he allegedly recklessly caused the death of another person. (Penal Law § 125.15 [1].) This appeal is from a dismissal of the indictment on a finding at Supreme Court that the proof adduced was legally insufficient under the statute to sustain the manslaughter charge. The evidence before the Grand Jury was almost entirely undisputed except as to two aspects, namely, the time interval between two shots and whether the decedent, during that period, continued to hold a butcher knife in her hand as she slashed and thrashed at two ESU officers who had been overcome by her.

To fully appreciate the significance of the legal issue on this appeal, it is necessary to review in detail the underlying facts which led to the attempted eviction, the circumstances pertaining to the police entry into the apartment and the events prior to the actual shooting. These have a direct bearing upon the question of whether, under the circumstances, defendant's actions amounted to gross recklessness under the appropriate statutory standard sufficient to impose criminal responsibility for manslaughter in the second degree.

Eleanor Bumpurs was a 66-year-old, "massive" and obese woman, weighing approximately 275 pounds. She resided in apartment 4A in the Sedgewick Houses at 1551 University Avenue in The Bronx and had lived there since September 1982. It is undisputed that her April 1984 rent payment was late and she went into arrears in July 1984. By frequent communication and direct contact with Mrs. Bumpurs and her children, who lived elsewhere, several city employees then

embarked upon a lengthy program to provide assistance with respect to the rent. Nevertheless, no rent was paid between July and October 1984. In July of 1984, the Housing Authority notified Mrs. Bumpurs in writing that payment would be required to avoid eviction. On July 18, when this notification went unanswered, housing assistant Richard Wallach tried to serve a three-day nonpayment notice, but Mrs. Bumpurs would not open her door. Speaking through the door, she informed him that she was withholding rent because of certain maintenance problems. Subsequently, however, maintenance men were sent to her apartment but she refused to allow them to inspect the premises to ascertain the need for repairs. As a result, on August 8, 1984, a petition for eviction for nonpayment of rent was served and a warrant of eviction was finally issued on September 6.

The eviction did not proceed, in part because of the continuing efforts by Housing Authority personnel to secure necessary financial and other assistance for Mrs. Bumpurs. More than three weeks after the order of eviction, on September 28, 1984, she told Barry Carey, assistant housing manager, in a telephone conversation, that she was unable to use the stove or bathroom and that she had withheld rent because "people had come through the windows, the walls, and the floors, and had ripped her off." She hung up after telling him that she was paying her rent into court. The same day, when Carey and Wallach visited her and she repeated the need for such repairs, she greeted them at the door holding "a large carving knife". During the conversation, she pointed at and threatened Wallach, proclaiming, "I'm going to get him." Subsequently, on October 11, Mrs. Bumpurs told Carey she would admit maintenance personnel for the purpose of making repairs. When he accompanied the maintenance man to the apartment on October 12, 1984, she was again armed with the same large carving knife. Contrary to her complaints, the light switches did work, as did the stove. However, when the maintenance man opened the bathroom door, a lot of large flies streamed from the bathroom and there was "this horrible smell" from cans of human excrement. When this was called to her attention, she claimed that "Reagan and his people" had done it.

During this period, the efforts by the Housing Authority to secure payment of the rent extended beyond direct contact with Mrs. Bumpurs in that there were several attempts to communicate with her adult children, who, on this record,

demonstrated a complete lack of interest in their mother's plight and no desire or willingness to lend her assistance. On September 28, 1984, Carey sent separate letters to Mary and Terry Bumpurs, her daughters, requesting that they contact him by October 2 regarding a matter of "utmost importance" involving their mother. The letter to Terry was returned with a postal notation, "addressee unknown", but the correspondence to Mary Bumpurs was, in fact, delivered since, on October 2, 1984, Mary called Carey, claimed she knew nothing about the contemplated eviction, stated that she would speak to her mother and communicate with either Wallach or Carey. Thereafter, she called neither and, in fact, apparently did nothing further.

In addition to these efforts by Housing Authority personnel, there were several attempts by the City Department of Social Services to assist her. A departmental caseworker, Herman Ruiz, called Mrs. Bumpurs on October 12, 1984, during which conversation she told him she had paid the rent, repairs were to be made by the Authority and then, after calling Ruiz "stupid", hung up. On October 15, Ruiz personally tried to visit her at the apartment but she would not open the door, insisting that she had paid the rent. There were also several further attempts to ascertain Terry Bumpurs' whereabouts and numerous calls were made to Mary Bumpurs. On October 24, 1984, Ruiz went to Mary's residence and, after trying the apartment door, left a letter in her mailbox, urging that, if she was Eleanor's daughter, it was "very important to hear from her as soon as possible" and advising that this was "an emergency". Thereafter, on the same day, he visited Mrs. Bumpurs, told her that the agency wished to assist her to avoid an eviction which was scheduled for October 29, 1984 at 9:00 A.M., and gave her a letter to that effect. When he returned to his office, he requested that a psychiatric examination of Mrs. Bumpurs be held.

As a result, on October 25, 1984, Ruiz accompanied a psychiatrist, Dr. Robert John, to evaluate Mrs. Bumpurs. When she admitted the psychiatrist to the apartment, she was again carrying a kitchen knife in her right hand. She told him that her children had been killed by Reagan and Castro, who lived in the building, and that the people next door wanted her apartment to use as a whorehouse. During the interview, Ruiz asked her about Terry and Mary and whether they would help her, to which she responded, "[Y]ou know how they are." Dr. John concluded that she had impaired judg-

ment and was unable to manage her own affairs. In his opinion, she suffered from delusions and hallucinations, was psychotic and in need of medical help. While his opinion was that her attachment to the knife was a security device, he believed that if one were to enter the apartment to disarm her, she would regard it as a threat and would use the knife in defense. As a result, it was decided that she should be hospitalized for treatment after her eviction.

Inasmuch as all attempts to offer her assistance with respect to the rent arrearages were met by Mrs. Bumpurs' hostility and opposition and a complete lack of cooperation on the part of her family, the eviction was scheduled for October 29, 1984 at 9:00 A.M. At the time, the rent arrearages were for a period in excess of four months. On the date of the eviction, in addition to the city Marshal, there were many other people present, consisting of the housing project manager (Wallach), Ruiz and another caseworker from the Department of Social Services (John McCauseland), two emergency medical service technicians (Gregory Zeek and Paul Smith), a Housing Authority maintenance man and moving men. In accordance with standard procedure, two city Housing Authority police officers (Colombo and Carrasquillo) were present, were furnished with the psychiatric evaluation and were told by Wallach that Mrs. Bumpurs was emotionally disturbed; that it would be a "messy job" since she was "violent"; and she was "extremely large and she always carried a knife." Before going upstairs, they had radioed for back-up assistance, reporting "a violent EDP, emotionally disturbed person" and waited for New York City Police Officers Boyce and Medina to arrive.

On arriving at the fourth floor, one of the Housing Authority policemen, Carrasquillo, was the first to approach the apartment. He knocked on the door, identified himself as a Housing Authority policeman and told her she should open the door—that they would like to speak to her. She screamed that if they came in she would kill them, adding, "I've got some shit for your ass." Although there were repeated requests imploring her to open the door, she did not comply. The officers' pleas to gain admittance were completely unsuccessful and were met by her continuing barrage of threats and abusive language. A neighbor on the same floor, Florence Peaks, also tried, unsuccessfully, to persuade her to cooperate. When one of the officers told her that they would have to remove the lock and come in, she screamed that if they did she would kill them all.

At this point, it was decided to radio for ESU assistance, which, according to the patrol guide, is the standard operating procedure to be followed when confronted by a potentially dangerous person barricaded inside an apartment. According to Officer Medina, she was "arrogant" and "sounded very violent." The officers also noticed a strong odor coming from the apartment which they described as "an acrid odor in the hallway", smelling like insecticide.

The Police Emergency Service Unit is a distinguished unit of volunteers, comprising 238 officers; it is the "heavy weapons unit" of the police department, which responds to calls involving violent, emotionally disturbed persons, those barricaded within a particular location and hostage situations. ESU officers are carefully selected and must be recommended for their assignment by a commanding or superior officer, based upon qualifications which include three years' police experience, "an absolutely good reputation", "solid stability" and adaptation to "functions involving mechanical manipulations". They receive extensive specialized training in methods to contain disturbed persons and are frequently called to respond to situations involving threats to jump from bridges, drownings and attacks by vicious animals. They also render assistance in disasters and ESU officers, who are all emergency medical technicians, are trained in the use of oxygen and resuscitation equipment.

There was extensive testimony before the Grand Jury as to the several available alternative procedures set forth in the ESU manual, particularly with respect to disturbed persons. ESU's commanding officer, Deputy Inspector John Lynch, testified that tear gas was not recommended for use with such persons but, in fact, was to be avoided since it can make them more violent and exacerbate the situation. The police department has also found various problems associated with its use, especially for those with lung problems, such as emphysema. In addition, certain types of tear gas will result in fires and, in a confined area like an apartment building, could have an impact upon other tenants in adjacent apartments since the gas can spread through air-conditioning and central heating systems.

While officers are authorized to use Mace in self-defense or to subdue a person, manufacturers advise that it can agitate persons who are either mentally disturbed, deranged, or under the influence of drugs or intoxicants. Thus, the use of Mace may be counterproductive. As to tranquilizers, established

police policy precludes the use of such drugs on human beings. Nor has the department been authorized to use a taser, which is a flashlight-like device which transmits a low amperage charge into the nervous system, resulting in muscular spasm which can disorient a person. Lynch stated that although the device was introduced in 1971, there has been great concern about the impact on people with heart problems and its use has been outlawed in this State. In certain circumstances, the ESU does employ various types of nets, primarily for jumpers, but there are clear limitations which prevent their use in an enclosed area, such as an apartment, because of the low ceilings.

The primary standard response with respect to emotionally disturbed persons is the use of an EDP bar, an eight-foot pipe, fashioned into a shaft with a U-shaped fork, to pin an armed subject against the wall. The main objective is to take the person into custody without harm while, at the same time, preventing injury to the officers. The guidelines also require that a 12-gauge pump-action shotgun be deployed at the rear as a safeguard or backup. Officers are explicitly instructed and authorized to shoot only in an absolute emergency, when "somebody's life [or] the life of the officer is in immediate jeopardy." The department prohibits the firing of a warning shot and officers are directed to shoot at the body mass or chest area, not at extremities, so that the shot will be most effective in stopping the threatening person.

Thus, to subdue and contain emotionally disturbed persons, the indicated front line of approach consists of the police carrying plastic shields, manipulating an EDP bar to maintain a sufficiently safe distance and to immobilize and pin the subject against the wall or knock him down, with standard operating procedure requiring the deployment of a shotgun as an emergency backup, to protect the lives of the officers or others.

The ESU manual on "Operational Policies and Tactics" is instructive in clearly setting forth and warning of the dangers associated with the pursuit and capture of "Dangerous Psychotics", warning that "all mentally disturbed persons are potentially dangerous": "The pursuit and capture of psychotics who display vexing unpredictability and an eerie potential for violence, can be especially menacing for members of the Emergency Service Unit. Many have been injured over the years answering calls to assist precinct personnel in subduing ex mental patients and other disturbed persons who go sud-

denly and inexplicably beserk and threaten harm to themselves or others. The lack of conscious criminal intent in most 'psycho' cases is small consolation when the crazed individuals are tough and burly and brandish weapons. *Humane considerations, however, take precedence and E.S.U. personnel shun the use of weapons to engage in less lethal hand-to-hand combat, often risking serious injury to themselves"* (emphasis added).

On October 29, 1984, ESU Officers Elter and Paulson responded to a radio dispatch of "a violent EDP" at 1551 University Avenue. They arrived at about 9:40 A.M. and went upstairs to the fourth floor, carrying the tools needed to gain entry to the apartment. They were advised by the Housing Authority officers that there was an emotionally disturbed woman inside, that she was about 67 years of age, very large, usually brandishing a knife and "possibly could be cooking some lye." Elter knocked, identified himself as a police officer and asked decedent to open the door so that they could talk to her. If she did not, he stated, they would remove the lock. Numerous other attempts to persuade Mrs. Bumpurs to open the door were similarly unsuccessful.

Paulson returned to the ESU truck, secured an EDP bar, a plastic shield and other equipment and went back to the fourth floor, when the ESU officers again attempted to convince Mrs. Bumpurs to open the door. She yelled, "Don't come in, somebody is going to get hurt." Paulson then punched out the top lock on the door, and he and Elter looked inside through the hole, noticing "a cloudy, foggy type of atmosphere" and smelling "some type of caustic liquid." Both saw Mrs. Bumpurs standing behind the door, holding a butcher knife in her hand, pointed upwards. They implored her to drop the knife and open the door and advised that if she refused, they would have to force entry. When she again responded that if anyone came in he would get hurt, it was decided to call for back-up assistance. During the exchange, Housing Officer Colombo had taken the strap from his nightstick and wrapped it around the doorknob to keep her from opening it and charging out. While they waited for the back-up unit to respond, Paulson again observed Mrs. Bumpurs through the hole in the door, still holding the 10-inch butcher knife in her right hand, with the blade up, at a 45 degree angle. Paulson used his radio to transmit confirmation that the EDP was armed with a knife and he requested a shotgun as additional back-up equipment, in addition to gas masks. The other Housing policeman, Carrasquillo, confirmed that he

had also observed Mrs. Bumpurs standing behind the door with a knife in her hand and that the odor smelled like lye.

The ESU back-up units arrived moments later. Officers Adams and Tedeschi had responded to a radio transmission of an emotionally disturbed person, barricaded in an apartment, armed with a knife and possibly cooking lye. Defendant, ESU Officer Sullivan, responded to the same dispatch. Elter radioed them from upstairs to bring a shotgun, gas masks, protective vests and a plastic shield. Adams, Tedeschi and Sullivan went inside the building, with Tedeschi taking the shotgun from his vehicle. In the elevator, Tedeschi noticed that his shoelace was untied and, when he bent down to tie it, he handed the shotgun to Sullivan, who retained it in his possession.

The fourth floor hallway was crowded with people. The arriving ESU officers were advised that there was an elderly female inside, armed with a knife and with a case history of throwing lye. After Adams and Tedeschi looked through the hole in the door, Adams saw Mrs. Bumpurs standing behind the door, still holding the knife in her right hand. He tried to talk to her, pleading with her to open the door and come out —that he wanted to talk to her and did not want to hurt her. Although he said this over and over again, there was no response. Tedeschi similarly tried to communicate with her but to no avail. They noticed a mist or vapor in the living room and noticed "a strong chemical smell", which smelled like insecticide. Sullivan also looked in and observed a "very thick haze" and an odor, which he said smelled like bug or roach spray.

Subsequently and before any action had been taken, ESU Sergeant Musac arrived on the scene, which he described as "a very tense situation". The ESU officers were taking turns looking through the opening in the door and attempting to engage Mrs. Bumpurs in some dialogue, with no success. They discussed at some length a variety of alternatives to be followed. One method, which was considered and rejected, was to open the door quickly, pinning Mrs. Bumpurs between the door and the back wall. This was rejected because the limited space available was insufficient to allow them to get in quickly and subdue her. There was the possibility of taking the door off the hinges. When it was noticed that Mrs. Bumpurs had finally left her position behind the door and moved to the living room, away from the kitchen, it was decided that now was an opportune time to enter the apartment and restrain her.

An immediate plan was devised. The officers were equipped with gas masks and bullet-proof vests. Elter was assigned to carry the EDP bar, Adams and Tedeschi to carry the plastic shields and, according to Sergeant Musac, Sullivan "had the rather grim assignment, if all else failed, he would have to use the shotgun to stop Mrs. Bumpurs from seriously injuring one of the police officers." Sullivan was the only one not equipped with a gas mask or goggles since this would impair his vision. Elter, equipped with the EDP bar, entered first, followed by Adams and Tedeschi carrying the plastic shields and then by Sullivan, whose job, as backup, was to protect the three officers. Paulson was holding a rope to secure the door once it was opened. Sergeant Musac remained at the doorway and did not enter the apartment until after the fatal shot.

At the time the officers entered the apartment, Mrs. Bumpurs was in the living room, sitting on a stool. She still had a large butcher knife, with a 10-inch blade, in her hand. As Elter approached, she stood up and came toward him. He placed the U-bar around her midsection to block her and she started "slashing back and forth with the knife." According to Elter, she was "hacking" at him with the knife, hitting the bar. Adams, who had the shield in a raised position, tried to block her approach since Elter had no protection other than the EDP bar. She jabbed into Adams' shield, taking 4 or 5 slashes across it, "about head level". This allowed Elter to get the U-bar into the area of her stomach in an attempt to pin her against the wall. It did not stop her and, undaunted, she continued moving closer. Elter, holding the bar, backed up and lost his footing, enabling Mrs. Bumpurs with her left hand to swipe the bar almost completely to the floor. When Adams tried to hit her right hand with the shield, she slashed at him violently, causing him to falter, step back and fall down at the same time. The police officers testified that she had placed Adams in a position where it appeared that "she was coming over the top of the shield" and he had to go down, almost on one knee, with the shield over his head, leaning back. Elter, who had somewhat recovered, again pushed at her with the bar and Tedeschi moved in to help. However, Elter "faltered again" and she pushed the bar to the side and started approaching and striking at Elter with the knife. He lost his balance and fell forward.

In that situation, with Elter going down and Adams on one knee, ducking but holding the shield over his head for protection, Sullivan stepped forward for the first time and called to

her three or four times in a loud voice to drop the knife. The defendant stated that after Mrs. Bumpurs had ignored the command and continued toward Elter with the knife, he fired the first round. At the time, he was fearful for Elter's safety because he had lost his balance and was going down, helpless and unable to protect himself. He believed the first shot missed since it had absolutely no effect on her. She continued moving forward, slashing violently and he pumped another shell into the chamber and fired a second round, which struck her in the chest. This apparently stopped her and, for the first time, caused her to back up to the corner of the kitchen doorway, where she turned and, with her back against the wall, slumped to a sitting position.

During the entire confrontation, which lasted between 30 and 45 seconds from the time the officers entered the apartment, they repeatedly told her to drop the knife—"continuously from the moment we approached the lady". This was undisputedly confirmed by Sergeant Musac, Officers Medina, Carrasquillo, Boyce and Colombo, by the Social Services caseworkers, McCauseland and Ruiz, by one of the emergency medical specialists, Gregory Zeek, and by Marshal Iopollo. From his position in the hall, Zeek heard the entire incident, including the scuffle inside the apartment and the officers pleading with her to put the knife down.

At the time of the first shot, Officer Adams, who had been knocked down, was in a squatting position and could not see whether the shot had hit Mrs. Bumpurs. Between the two shots, he was in the process of standing up and, while he saw her lower torso, he could not see her arms. Elter, who was off balance when the first shot went off, felt the "surge of air." Although he expected to see her fall, she did not and kept coming at him until the second shot struck her in the chest. Although Elter did not know whether Mrs. Bumpurs had the knife in her hand after the first shot, she continued to move toward and menace him.

Both Sullivan and Paulson, however, testified that she continued to slash with the knife during the time interval between the shots. While Paulson could not see if the first shot hit her, he did observe that she still had the knife and she was still slashing with it when the second shot was fired. According to Sullivan, between the shots he again yelled at her to drop the knife. Although Officer Colombo, from his vantage point in the hall, could not see the entire exchange, he did see Sullivan's face when the shot went off and testified

that his facial expression caught his attention and it indicated to him that he wanted her to drop the knife—"He was pleading with her."

Contrary to the testimony of Sullivan and Paulson that decedent continued to slash at the officers with the knife between the shots, Dr. Osborne, who treated Mrs. Bumpurs in the emergency room of Lincoln Hospital after the shooting, was of the opinion that the first blast struck her in the right hand and was of such a nature that it was "anatomically * * * impossible" for her to be able to grip the knife after the first shot. He described the injury to the hand as "like a bloody stump"—the thumb and index finger were missing and there was a semicircular type of wound to the rest of the hand, with 4 or 5 fingers "crumpled over and sort of dangling down by pieces of skin that weren't really fully attached to the hand". The chest wound was fatal and, since he found no fragments in the chest of wood, metal or bone from her fingers, this indicated to him that the injury to the hand resulted from a separate shotgun blast and not the one that caused the 2- or 3-inch chest wound.

The medical examiner, John Pearl, agreed that there was extensive damage to the hand and that three fingers were "inoperative". He also concluded that the hand and chest wounds were caused by separate shots, but he could not determine from the autopsy which shot struck decedent first. He did testify that, after she received the wound to the hand, "she would not have been capable of holding anything" and that the injury to the hand, in any event, would not cause any impairment of the ability to use the arm from the shoulder joint to the waist joint. Although he was not entirely sure, he stated that a person of Mrs. Bumpurs' height and weight could have remained standing after the chest wound, although the shot would have stopped her and, while it was likely that it would have knocked her down, she could have resumed her forward motion.

In presenting the case to the Grand Jury, the District Attorney relied upon this expert testimony to raise in issue whether decedent had possession of the knife during the interval between the shots. There was also a conflict as to the amount of time which elapsed between the shots. Sullivan stated that he thought the first shot missed since she kept coming, thrashing with the knife. He testified that he immediately pumped the shotgun and fired the second shot one second later. According to Tedeschi, the second shot was fired

"almost immediately" after the first. Elter stated that the shots were "almost a second" apart; Adams, "about a second"; Paulson, "one to one and one-half seconds"; Medina "a second or two"; Colombo, "one-half to two seconds"; and Carrasquillo and Boyce, a "second or two". Marshal Iopollo and Herman Ruiz referred to a "slight pause" or "short pause" between the shots, of a couple of seconds, while McCauseland stated that the shots followed "almost immediately". Mrs. Peaks referred to the second shot as "seconds after the first," while Wallach referred to the time interval as 2 or 3 seconds. Sergeant Musac testified there was a three-second time interval between the shotgun blasts but another neighbor, Rosalee Thomas, stated that the shots were one after the other, "like bam, bam, one right behind one another." Victor Garcia, a neighbor's husband, referred to the interval as three seconds, and the two emergency medical technicians, Zeek and Smith, stated, respectively, that the shots were separated by "three to five seconds" and "three seconds".

When Mrs. Bumpurs slumped to the floor after the second shot, the officers immediately called for medical assistance. The blade of the knife was recovered from the floor and pieces of the wooden handle were retrieved by Tedeschi. Both he and Adams examined Mrs. Bumpurs' injured right hand but did not see whether any fingers were missing. Despite the several reports and the officers' fears, no lye was found in the apartment and there was nothing cooking on the stove, although the paramedic, Zeek, did notice a waxy, paraffin substance on the stove.

The two emergency medical technicians entered to provide assistance to Mrs. Bumpurs for her gunshot wounds in the right hand and right upper chest. Zeek described the hand injury, referring to the fact that there were three fingers missing. They tried to stabilize and monitor her vital signs but, because she was so obese, they could not move her into the living room. She was conscious and moaning. Despite her serious injuries, she continued to yell and resisted the aid offered by the paramedics. Officer Carrasquillo heard her curse at the emergency medical personnel, "[G]et off me you mother fuckers, or something like that". She attempted to remove the oxygen mask after the medical technicians had struggled to put it on and pulled out the intravenous line, Smith referring to her as "flopping around" and "fighting us off".

On review of the record and all the facts and circumstances,

we agree that the indictment for manslaughter in the second degree was properly dismissed. In concluding otherwise, our dissenting colleague finds that there is a factual dispute regarding the time interval between the shots and whether decedent had possession of the knife during that period, and states that the issue should be resolved by a petit jury and not on a motion to dismiss as a matter of law.

While we do not quarrel with the premise that factual issues are to be resolved by a jury after trial, under the circumstances present here, involving a police emergency response to a very critical and fast moving situation, it is patently clear that defendant acted instantaneously to protect his downed and almost helpless fellow officers and out of a real fear for their safety. Plainly, this was uppermost in his mind and he fired only after repeated pleas to drop the knife, at a time when the decedent had immobilized and forced two officers to the ground and continued to slash at them, with an increased likelihood of success. Bearing in mind the nature of the police response here and their training and directives, in our view, defendant's actions, consistent with police guidelines and in furtherance of his duties, do not rise to the level of gross recklessness so as to impose criminal responsibility.

The record shows that the police officers acted with great apprehension and fear in what they perceived to be a real danger. They knew that Mrs. Bumpurs was armed with a lethal weapon and that she had made several threats to kill them. They also believed what they had been told, namely, that she was cooking a substance which they suspected was lye and that it might be thrown at them if they entered the apartment.

The underlying fear and concern which permeated the confrontation is reflected in the long period of time during which they carefully deliberated as to their various alternatives, most of which were rejected because they feared that, if unsuccessful, Mrs. Bumpurs or someone else would get hurt. While the officers repeatedly attempted to persuade her to come out peacefully and carefully studied her actions through the hole in the door, they did so only after placing one of the plastic shields against the opening to protect themselves against the possibility that she might plunge the knife through the hole. That they proceeded with utmost caution is perhaps best illustrated by the several portions of the record which reflect their apprehension that decedent would leave the apartment and attack others in the hall. Thus, during

most of the period of time that they were in the hallway, and later, before they entered the apartment to disarm decedent, the officers had wrapped the thong of a nightstick around the doorknob to secure the door.

In our view, the record as a whole shows that there was an immediate threat to the lives of the officers and others in the immediate vicinity, all of which must be taken into account in evaluating defendant's actions. This risk must be judged in light of what Officer Sullivan and his fellow officers then reasonably perceived—not with the calm deliberation and detached perspective afforded by hindsight. The issue must be considered in the light of the exigent circumstances which confronted the officer at the time, a far cry from the objective reflection available to us on judicial review.

Penal Law § 125.15 (1) provides in part that a person is guilty of manslaughter in the second degree when he "recklessly causes the death of another person". Recklessness, for purposes of criminal responsibility, is defined in Penal Law § 15.05 (3) as follows: "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a *gross deviation from the standard of conduct that a reasonable person would observe in the situation"* (emphasis added).

In considering a motion to dismiss an indictment, the operative test is whether there was "a clear showing that the evidence before the Grand Jury was insufficient." *(People v Howell,* 3 NY2d 672, 677.) On such a motion, viewing the evidence in a light most favorable to the People, the dispositive question is "whether there was 'competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant's commission thereof' (CPL 70.10, subd 1)." *(People v Warner-Lambert Co.,* 51 NY2d 295, 298, *cert denied* 450 US 1031; *see also, People v Dunleavy,* 41 AD2d 717, *affd* 33 NY2d 573.) There must be a clear showing of insufficiency and the burden on the motion is on the defendant *(People v Howell, supra,* at p 677; *People v Deitsch,* 97 AD2d 327, 329). The standard to be applied, the Court of Appeals has held, "is whether the evidence before the Grand Jury if unexplained and uncontradicted would warrant conviction by a trial jury". *(People v Pelchat,* 62 NY2d 97, 105.) In our view, it does not.

The dissent places critical significance on the discrepancy in the proof relating to the time interval between the shots based upon the expert opinion as to the decedent's capacity to have held a knife during the period between the first and second shot. While the overwhelming number of witnesses stated that the shots came one right after the other, separated by 1 or 2 seconds at most, it is urged that, if a jury were to find that the time interval was 4 or 5 seconds, as testified to by one of the emergency medical technicians, and further, were the trier of the facts to conclude that Mrs. Bumpurs did not hold the knife after the first shot, then the defendant had sufficient opportunity to conclude that she was unarmed at the time of the fatal shot.

However, this approach fragments a rapidly unfolding situation, the dire emergency which confronted the officers and the fact that they gave careful and deliberate consideration to the possible alternative methods before entering the apartment. They were confronted with a known violent, psychotic person, armed with a deadly weapon, whom they reasonably believed had a history of throwing lye and who had made several threats of violence. They were aware of Dr. John's psychiatric evaluation and had apparently been apprised of the city's prior efforts to assist Mrs. Bumpurs and the fact that such attempts were rebuffed by decedent and ignored by her family. Taking into account all the facts surrounding this crisis, the duration of the entire confrontation—no more than 30 seconds from the time the police entered the apartment until the first shot—and the additional fact that Mrs. Bumpurs had effectively immobilized and was fatally threatening two of the officers, slashing at both with a knife, we conclude that fear for the safety of his fellow officers was defendant's prime concern. In our view, he acted reasonably, firing only after repeated pleas to drop the knife had gone unheeded. There was no gross deviation from the appropriate standard.

Under the circumstances, whether the second shot was discharged one or more seconds after the first is not the decisive factor. Further, it has not been established whether Mrs. Bumpurs was shot first in the hand or in the chest. We do know she was not deterred even after sustaining both serious wounds. One officer had been forced into a very vulnerable squatting position, gripping a plastic shield desperately over his head for protection against a slashing butcher knife, and the other officer was falling, off-balance, and was rendered helpless by decedent's relentless attack. Neither had

any weapon for protection as she continued toward them, slashing with the knife; their only defense—the shield—was unavailing. As observed by Justice Holmes in another context: "[d]etached reflection cannot be demanded in the presence of an uplifted knife." *(Brown v United States,* 256 US 335, 343.)

Viewed in that context and taking into account the prevailing directives, which required that the officer shoot at the body mass, defendant's action was not "a gross deviation from the standard of conduct that a reasonable person would observe in the situation." (Penal Law § 15.05 [3]; § 125.15 [1].) Whether his action could give rise to civil liability is not before us. It does not, however, amount to recklessness sufficient to support a criminal charge for manslaughter in the second degree.

A contrary determination would render the police helpless to act in such situations and would deprive them of the needed ability to respond promptly in the proper discharge of their duties. Law enforcement officials may not be stripped of their ability and right to take fair and reasonable protective measures necessary under the circumstances, particularly in their own defense, when viewed in the light of the life-threatening criminal activity which then confronted them. To hold Officer Sullivan's action here to be reckless or a gross deviation from reasonableness is contrary to what a disinterested and objective evaluation discloses. As a result, we find the indictment insufficient as a matter of law.

Acknowledging that the Grand Jury could have reasonably concluded that the first shot did strike Mrs. Bumpurs' hand and dislodged the knife, the issue presented is this:

Under the circumstances, may criminal liability be imposed upon a police officer, who in good faith believed that his first shot had missed Mrs. Bumpurs and that his brother officers continued to be in imminent danger, on the basis that he failed to observe in a few tension-filled seconds that a shot aimed at her chest, had somehow struck her hand, and dislodged the knife? We can see no conceivable view of the evidence which would justify the conclusion that the failure, under the circumstances, to have perceived the result of the first shot, if indeed there was such a result, was a "gross deviation from the standard of conduct that a reasonable person would observe in the situation."

Accordingly, the order, Supreme Court, Bronx County (Vincent A. Vitale, J.), entered April 12, 1985, dismissing the indictment, should be affirmed.

ROSENBERGER, J. (dissenting). I dissent and would vote to reverse the order which, based upon an inspection of the Grand Jury minutes, dismissed the indictment which had charged the defendant with manslaughter in the second degree.

Criminal Term, in its decision and order, correctly noted that "dismissal of the indictment may only be granted if the evidence is not legally sufficient to establish the count charged * * * or any lesser included offense. (CPL 210.20 subd. 1, par b)." It also noted that in making such a determination the evidence presented to the Grand Jury is to be viewed in the light most favorable to the People. *(People v Warner-Lambert Co.,* 51 NY2d 295, 299.) In two significant respects, Criminal Term did not adhere to these mandates.

The indictment arises from the attempt on October 29, 1984, to evict Eleanor Bumpurs, an obese, arthritic 67-year-old woman from her apartment in a New York City public housing project for nonpayment of rent. Prior to the date of the eviction, Housing Authority officials had communicated with two daughters of Mrs. Bumpurs to ask their assistance in dealing with their mother's situation. One of those officials also asked the aid of the New York City Department of Social Services. A psychiatrist visited Mrs. Bumpurs in her apartment four days prior to the eviction. The psychiatrist the next day reported that Mrs. Bumpurs was in need of hospitalization. He also noted that during most of the visit she was holding a long knife. Housing officials had, on previous visits to Mrs. Bumpurs in her apartment, noted that she held a knife in her hand. Neither the psychiatrist, nor any of the Housing officials had been threatened or assaulted during any of their visits.

The efforts of the project managers to gain immediate aid for Mrs. Bumpurs from her family or the Department of Social Services were unavailing. On October 29, the eviction was to proceed. A city Marshal, Housing police officers, Department of Social Services workers, Emergency Medical Service technicians, and others went to the apartment. One of the Housing police officers told the others that Mrs. Bumpurs had a history of throwing lye. The genesis of that rumor is unclear. It did, however, travel among those there assembled. There is nothing in the record to indicate that she had, at any time, ever thrown any lye.

When Mrs. Bumpurs refused to open the door, the Housing

police present called for assistance from the New York City Police Department's Emergency Service Unit (ESU). Before entry into the apartment was made, at least six ESU officers were present in addition to the other persons previously on the scene. They were equipped with, in addition to their usual side arms, a pump-action shotgun fully loaded with five rounds of double 0 buckshot (each shell containing nine pellets, each the size of a .32 caliber bullet), an "EDP bar" (a seven-foot-long iron bar with a U-shaped piece at its end, used to pin an emotionally disturbed person to a wall or floor), plastic shields, gas masks, and bullet proof vests.

Upon the failure of their entreaties to Mrs. Bumpurs to admit them, the police entered the apartment, after removing the locks and saw her seated on a stool at the far end of the living room. She arose from her seat and came towards them. One of the officers placed the EDP bar in her midsection, while she started swinging the knife which she still held. Another officer tried unsuccessfully to knock the knife from her hand with his plastic shield. The officer with the EDP bar tried to change his grip on it and Mrs. Bumpurs pushed it down. Several further attempts to pin her to the wall with the bar failed. The officer using the bar lost his balance and started to fall forward, whereupon Mrs. Bumpurs started to come out from behind the U-shaped front of the bar, still swinging the knife. Since their entry into the apartment the police officers had been shouting to her to drop her knife.

At this point, the defendant, the ESU Police Officer carrying the shotgun called "drop the knife" several times. When Mrs. Bumpurs did not comply, he fired two shots from the shotgun, pumping the gun to chamber another round between shots, each of which hit the decedent. After the second shot, she fell to the floor in the kitchen. One of the other officers present picked up the knife and some shattered pieces of the handle from the floor of the living room.

The testimony concerning the lapse of time between the two shotgun blasts is critical. The Grand Jury minutes reveal conflicting testimony on this issue. In its decision and order Criminal Term stated that the shots were separated by 1 to 3 seconds. There was testimony, however, that the shots were separated by 3 to 5 seconds. Obviously, the 3- to 5-second interval was that most favorable to the People and that which the court should have adopted, for purposes of this motion.

The defendant testified under a waiver of immunity. He

stated that after firing the first shot at Mrs. Bumpurs from a distance of about two feet, he pumped another shell into the shotgun chamber, since it appeared to him that the first shot had "no effect whatsoever". He further testified that when Mrs. Bumpurs continued "slashing and slashing" with the knife he fired the second shot at her chest. Of the other five police officers who were present in the room at the time of the incident, only one testified to having seen the knife in Mrs. Bumpurs' hand after the first shot was fired.

Testimony was also heard from Sergeant Resua, the supervisor of the Criminalistics Unit of the New York City Police Laboratory. Sergeant Resua testified concerning his qualifications including Bachelor's and Master's degrees in forensic chemistry, authoring publications in criminalistic science* and teaching criminalistics at a university. He testified that he had done an analysis of a "partial knife blade and partial knife handle plus three pieces of wood" to determine the presence of lead or lead residue on any of them. He found a piece of lead imbedded in one of the three pieces of wood which he identified as having been part of the handle of the knife. He further testified that an analysis of the splintering and separation of the wood fragments indicated a condition consistent with a projectile hitting a piece of wood.

A detective who gathered some wood handle fragments in the apartment after the incident testified that he found wood chips under the sofa and imbedded in a sofa pillow.

Of great significance was the testimony of two medical experts. The first, Doctor Harold Osborne, is the director of the Emergency Medical Residency Training Program at Lincoln Hospital and in charge of that hospital's emergency room surgical section. He is board certified both in the field of internal medicine and in the field of emergency medicine, has written many articles, and coauthored two texts on emergency medicine. He testified as to his efforts to resuscitate Mrs. Bumpurs after she arrived at the hospital, not breathing and showing no signs of life.

He testified that Mrs. Bumpurs had been hit by two separate shotgun blasts, one to the hand and one to the chest, and explained to the Grand Jury the reasons for that finding. He described the injury to the right hand, including the fact that

---

* The application of physical science to the law. Scientific crime detection. The application of techniques from the physical sciences and psychology to the problems of criminal identification and apprehension.

the thumb and index finger had been blown off, with major damage to the rest of the hand. The fourth and fifth fingers were crumpled over, hanging by pieces of skin, and not fully attached to the hand. Dr. Osborne summarized his findings concerning Mrs. Bumpurs' right hand by describing it as "essentially a bloody stump of an arm at that point". He stated that it would have been anatomically impossible for Mrs. Bumpurs to have held anything in her right hand after it was struck with the shotgun blast.

Another medical expert who testified before the Grand Jury was Dr. John Pearl, Associate Medical Examiner of the City of New York. Dr. Pearl related his experience, which included 11 years as a medical examiner in the City of New York during which time he had personally performed 5,100 autopsies. Dr. Pearl testified as to the damage to Mrs. Bumpurs' hand. He found three separate holes in the hand, one of which still contained a shotgun pellet. After further description of the condition of the hand, Dr. Pearl testified that "after the hand received this wound, she would not have been capable of holding anything". He also testified in some more detail concerning the autopsy and the cause of death.

At no point in the court's 14-page decision is there any reference, whatsoever, to the testimony of the two medical experts to the effect that it would have been impossible for Mrs. Bumpurs to continue to hold the knife after her hand had been struck by the shotgun blast.

It is apparent that the Grand Jury accepted the testimony of the expert witnesses to the effect that it would have been impossible for Mrs. Bumpurs to have continued to hold the knife after her hand had essentially been shot away. It is apparent, also, that the jurors thereby rejected the testimony of the defendant and the other officer that Mrs. Bumpurs continued to hold the knife in her hand after the first shot had been fired. The Grand Jury remains the exclusive judge of the facts with respect to any matter before it. (CPL 190.25 [5]; *People v Pelchat,* 62 NY2d 97, 105.) In this case, Criminal Term substituted its own evaluation of the inferences to be drawn from the evidence for that of the Grand Jury, thereby usurping the Grand Jury's function as finder of the facts. *(People v Di Napoli,* 66 NY2d 812, citing with approval the dissent of Sullivan, J., 108 AD2d 650, 656 [1st Dept 1985].)

In its decision dismissing the indictment Criminal Term stated: "The evidence before the Grand Jury revealed that the

defendant's acts were in conformity with the guidelines and procedures outlined in the New York City Police Department Emergency Service Unit Manual. There was no proof or evidence before the Grand Jury upon which they could determine that the defendant acted outside the scope of his authority or that his actions did not conform to the specific mandates of his job. Under these circumstances there was no legally sufficient evidence to find that the defendant's conduct 'constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the same situation'." Without determining whether the foregoing would have constituted a proper standard, the observation is not supported by the evidence before the Grand Jury.

That evidence, accepted as it obviously was by the Grand Jury, showed that Mrs. Bumpurs no longer held the knife when the second, fatal, shot which struck her in her chest was fired. The Emergency Service Unit Operational Policies and Tactics Manual contains rules for the use of firearms. It states in chapter III, at page 17, "[M]embers will fire only when it is necessary to protect themselves or others from serious bodily harm". It cannot be said that the Grand Jury was unjustified in finding that Mrs. Bumpurs, no longer holding the knife after being struck with the first shot, posed no threat of serious bodily harm to anyone.

A review of the District Attorney's instructions to the Grand Jury was also requested by the defendant's motion. Criminal Term did not scrutinize the instructions since it found such scrutiny to be unnecessary, having found legal insufficiency in its review of the evidence. A review of the District Attorney's instructions reveals that they were adequate and proper. The defense of justification was fully and firmly explained as was the use of physical force and deadly physical force by a police officer in attempting to effect an arrest (Penal Law §§ 35.05, 35.10, 35.15, 35.30).

Accordingly, the order granting defendant's motion to dismiss the indictment should be reversed, the motion denied and the indictment reinstated.

SANDLER, J. P., ROSS and KASSAL, JJ., concur; ROSENBERGER, J., dissents in a separate opinion.

Order, Supreme Court, Bronx County, entered on April 12, 1985, affirmed.